UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHEN KOSLA,<br><br>Plaintiff,<br><br>vs.<br><br>FLEX TECHNOLOGIES, INC., et al.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 5:25-cv-00070<br><br>JUDGE JOHN R. ADAMS<br><br><br><br>**ORDER AND DECISION**<br>(Resolves Doc. 25) |

This matter is before the Court on Defendant Flex Technologies, Inc ("Flex") and Defendant Rachel Tetreault's ("Tetreault") (collectively "Defendants") motion for summary judgment on Plaintiff Stephen Kosla's ("Plaintiff") claims. Doc. 25. The matter is fully briefed. Docs. 31, 34. For the following reasons, Defendants' motion for summary judgment is GRANTED and this matter is DISMISSED.

## I. FACTUAL BACKGROUND

Plaintiff began his employment as a sales account manager with Flex in May of 2005. Doc. 2, ¶16. In March of 2019, Plaintiff was diagnosed with prostate cancer. Doc. 2, ¶17. "Plaintiff informed Flex Technologies of his diagnosis and took a brief medical leave of absence for surgery. Plaintiff returned to work after a successful operation left his cancer in remission." Doc. 2, ¶18. Kosla's medical team monitored his condition through periodic blood tests and approximately once-a-month office visits. Doc. 26, p. 35.

In 2021, Flex promoted Plaintiff to manage the sales team. Doc. 2, ¶19. At the time of his promotion, Plaintiff reported to the vice president, Will Beavers, and the president and owner, Glenn Burket. Doc. 26, p. 40. In May 2024, Will Beavers retired and Defendant Tetreault was promoted from accounting manager to vice president. Doc. 26, p. 43; Doc. 27, 8. As such,

Plaintiff's direct supervisors were Burket and Tetreault, with Tetreault providing guidance and Burket[1] retaining the "ultimate authority." Doc. 26, p. 44; Doc. 27, p. 9.

Flex's annual sales decreased each year during Plaintiff's tenure as sales manager. Doc. 25-2. In 2021, the company's annual sales revenue was $60,747,418; $57,911,910 in 2022; $42,619,943 in 2023; $37,177,860 in 2024. Doc. 25-2, ¶5

Due to this declining sales revenue, in June of 2024, Flex hired sales consultant and business advisor Mark Roberts to evaluate the sales team and coordinate any necessary training. Doc. 27, p. 25. Burket, Tetreault, and Roberts met on June 26, 2024 to "discuss growing sales and profits". Doc. 25-3, p. 4. According to the meeting notes, Plaintiff "may not have skills to drive revenue growth," Plaintiff was scheduled to retire in 8 months and therefore they needed to recruit and onboard a new manager, and "current salespeople need to be trained, given direction and Key Performance Indicators to drive sales growth." Id. Roberts recommended various assessment and training for the salespeople and to "[w]ork with [Tetreault] and possibly sales manager recruiter to find an onboard new sales manager in the next 4-5 months." Id. On July 9, 2024, Tetreault stated that

> I believe we need to replace the sales manager position and the engineering manager position. I don't think we need to put either of them out of a job but I feel like they are both not well suited for the position and that job is far too vital to our success. When [Burket] was in all the time to control them and the situations it was okay but I'm not sure I can do what [Burket] does in that manner. [Burket] has far more experience than I do so I need people who can do that job and be trusted to do it well. Our sales manager doesn't manage people[.] …[Burket] is well aware of the sales manager and we have a lead on fixing that when he's well enough to discuss and make a decision on that. He is aware the engineering manager is difficult but

[1] Burket was 90 years old at the time of the relevant events. Doc. 27, p. 9. Burket communicated with Tetreault primarily in person or on the phone, almost daily. Doc. 27, p. 11. "Sometimes he would come to the office. Sometimes he was in the nursing home." Id. During the relevant time, Tetreault did not make decisions without Burket's approval. Id. Burket died on November 3, 2024. Doc. 27, p. 8. Burket's nephew, Bob Moje, is the current president of Flex. Doc. 27, p. 10.

> I'm not sure he's aware of how bad it really is. We are set to have a planning meeting Wednesday next week and I'm looking forward to what we can learn there.

Doc. 25-4.

On August 12, 2024, Tetreault informed Roberts that Burket had directed her to look for a new sales manager. Doc. 25-2. Upon review of the sales team evaluations, Burket "was definitely ready to fire the sales team today" (doc. 25-5), because the evaluations indicated that none of them were qualified (doc. 27, p. 33). While Burket felt one of the salespeople, Brett Baum, did have potential to be manager, "we don't have time to wait for him to reach it we need an experienced leader asap." Doc. 25-5. Burket told Tetreault to terminate Plaintiff. Doc. 27, p. 33-34. On August 19, 2024, Tetreault engaged a recruiting firm to find Plaintiff's replacement. Doc. 25-2, ¶14; Doc. 25-6. While Burket wanted to terminate Plaintiff immediately, Tetreault wanted to find a replacement first. Doc. 25-2, ¶15.

On August 28, 2024, Tetreault informed Roberts that "What we would like from you at this point is to hire you for some additional training of our sales team. Namely Brett and Mike. [Burket] is very disappointed with [Plaintiff] and he may not be long for the company at this point." Doc. 26-6, p.2. In response, Roberts noted that Burket's "

> gut was right: [Plaintiff] is acting differently than a sales manager, and with large accounts, he is not a salesperson. He had way too many 'I don't know' answers to questions about GM that's done close to $2 million and other accounts. I advise giving him specific direction by month and having him report on his progress weekly. We keep him until we interview[] and found the replacement, but that's your call.

Doc. 26-6, p. 1. In response, on August 29, 2024, Tetreault stated:

> Agreed, we plan to terminate employment. [Burket] and I are disagreeing at the moment on this timeline. He wants him terminated now I want to wait until I have a news sales manager or at least some potentials. He is giving me more reason as he is not compliant with the things that I am asking of him. I also like to build a case to prevent unemployment.

Doc. 26-11, p. 3.

On or around August 30, 2024, Flex decided to demote Plaintiff to account sales manager. Doc. 27, p. 26. Flex asked their IT manager to work with Plaintiff to back up his computer because they were worried that Plaintiff would delete emails, communications or contacts. Doc. 27, p. 26, 41. Defendants were waiting for Plaintiff to cooperate with IT to complete that task before having the demotion meeting. Id.

On September 4, 2024 Plaintiff informed Tetreault that his cancer had returned and that he had an appointment with an oncologist. Doc. 26, p. 85-86; Doc. 26-9, p. 2. On September 6, 2024, Burket called Plaintiff and left a voicemail demanding that he comply with IT regarding the computer back-up. Doc. 27, p. 59. When Plaintiff returned the call, he informed Burket that his cancer had returned "to the point where it required radiation and chemotherapy treatments." Doc. 26, p. 73. Plaintiff indicated that he would meet with the oncologist after he returned from vacation. Doc. 27, p. 59. Burket told Plaintiff to let Flex know what he needed. Doc. 27, p. 58. Also on September 6, 2024, Plaintiff complied with IT and his computer was backed up. Doc. 27, p. 27.

On September 9, 2024, after Plaintiff's computer was backed up, Burket and Tetreault met with Plaintiff and informed him that he would be demoted to account manager effective October 1, 2024. Doc. 2, ¶26. "He argued that we weren't being fair. I stepped in and said that I felt that my opinion was based on the evaluations as well as the communications from the team and their lack of support from him, as well as Mark Roberts had told me that Steve told him he did not know how to be a sales manager." Doc. 27, p. 43. After the meeting, Plaintiff called Tetreault to discuss his reduced pay. Doc. 27, p. 46. Plaintiff was upset and worried about his health. Id. Tetreault indicated that he should "focus on his health and get better." Doc. 27, p. 47.

On September 18, 2024, Plaintiff met with a radiation oncologist to discuss a treatment plan. Doc. 29-5. At 3:35 on September 18, 2024, Plaintiff emailed Burket and Tetreault and informed that that he had met with the oncologist and that "as we discussed last week I am going to require radiation treatments to combat my cancer." Doc. 26-10. He informed them that the week of September 30, 2024, he would have a scan to confirm whether the cancer had metastasized and to pinpoint the exact location for treatment. Id. Plaintiff noted that he would need 38 treatments between approximately October 7, 2024 to December 2, 2024. Id. "I will still be able to work but I will be limited to local travel only (no overnights) and depending on times, I will require approximately 2 hours for each one of my treatments. Please forward me any paperwork that Flex requires to be completed by my oncologist." Id .

**<u>The Vertex Situation:</u>**

On August 15, 2024, Vertex, one of Flex's key customers, reached out regarding pricing. Doc. 29-9, p. 7. The inquiry was forwarded to Plaintiff on August 16, 2024. Doc. 29-9, p. 6. Plaintiff did not respond until August 21, 2024. Id. On August 22, 2024, Plaintiff informed Vertex that he had a management team meeting that afternoon and would get back to her later that day or the next. Doc. 29-9, p. 5.

On or around August 23, 2024, Tetreault, Roberts, and Burket had a meeting with Plaintiff and two other salespeople to discuss pricing. Doc. 27, p. 83. Roberts identified customers whose sales had declined from 2023. Id. The team specifically discussed Vertex, in part because the client had requested a price reduction. Doc. 27, p. 85. Roberts coached Plaintiff on a specific sales strategy, and upon further discussion, Burket told Plaintiff to offer a 2% rebate, up to 3%. Id. Roberts told Plaintiff to reach out to the client and ask her what she was looking for and then offer

the rebate 2% to 3%. Doc. 27, p. 86. Burket told Plaintiff to do it that day. Id. Plaintiff indicated that he would take care of it. Doc. 27, p. 87.

Despite Burket's directive, Plaintiff did not follow up with Vertex. As a result, on August 28, 2024, Vertex reached out again for an update. Id. On August 28, 2024, Plaintiff responded, but not as directed by Burket. Id. On August 29, 2024, Plaintiff emailed Tetreault asking for input on several action items, including Vertex. Doc. 29-8. Specifically, "Vertex-they are open to a % reduction, what do you want me to offer?" Id. In response, Tetreault reiterated the information discussed in the August 23, 2024 meeting: "[Burket] and [Roberts] said ask them what they are looking for % wise first, tell them we are looking to offer 2% over growth but we will go up to 3% per [Burket]." Id. Despite this clear directive, less than two hours later, Plaintiff emailed Vertex and offered a 1.5% rebate. Doc. 29-9, p. 4.

On August 20, 2024, after several clarification emails on his proposal, Vertex informed Plaintiff that it would discuss the proposal with the team and get back to him. Doc. 29-9, p. 3.

On September 10, 2024, Plaintiff followed up and Vertex informed him they would continue working with Flex. Doc. 29-9, p. 2. Plaintiff forwarded this email chain to Tetreault on September 12, 2024. Id. On September 18, 2024, Tetreault responded and asked why Plaintiff did not offer Vertex the terms discussed with Burket and Roberts. Doc. 29-9, p. 2. Tetreault cautioned that Vertex's responses were not necessarily committal and by not following the agreed-upon sales strategy Plaintiff could have lost the client. Doc. 29-9, p. 2. Tetreault further informed Plaintiff that Vertex was not pleased with the interaction, including Plaintiff's slow response. Specifically, Tetreault noted that she, Plaintiff, Burket, and Roberts met on August 23, 2024 and discussed the issue, but Plaintiff did not follow up with Vertex as expected. Id. Vertex stated that the offer

Plaintiff did make was not clearly explained. Id. As a result of the client's dissatisfaction, Tetreault agreed to assign them a new account manager. Id.

On September 19, 2024, Plaintiff called Vertex, despite knowing they had been reassigned to a new account manager, "to understand what I did wrong or could I have done anything different[.]". Doc. 26, p. 123-124. Plaintiff then responded to Tetreault's September 18, 2024 email, informed her that he had talked with Vertex and had a "pleasant conversation" and it did not appear that Vertex had an issue. Doc. 26-12. Plaintiff justified the delay in communications, contending that it was on Vertex's side, not his, and that "I did my job, I secured the business and saved the company money in the process, there was no need for you to 'negotiate' the business, it was already done.' I sent you the email merely so you were kept in the loop. And if you would have waited until I returned from my vacation, I would have reached out to [Vertex] as I [sic]today and completed this transaction." Doc. 26-12.

Later, Vertex informed Tetreault that "I wasn't sure what his objective was or if he was truly calling to see if everything was cool. I just told him everything was great and I appreciate the relationship with Flex and ended the call. I didn't engage with him. It was maybe a 2 minute call. I was going to mention it to you but decided to stay out of it as I didn't know why he was making the call. … "I appreciate you reaching out. I thought it was weird that he called but didn't think too much of it." Doc. 28-3, p. 2.

On September 19, 2024, after learning that Plaintiff called Vertex, Tetreault consulted with Burket. Doc. 27, p. 62. Burket told Tetreault to terminate Plaintiff immediately. Id. Tetreault tried to call Plaintiff, and when he did not answer, she wrote the following termination email:

> I spoke with [Burket] regarding the vertex situation and you calling her after she told me she was not happy with your interaction is not only undermining authority it is further embarrassing to the company. We have had many complaints from within the company about you not performing your job, shoving work off on others,

> and not wanting you to call on certain customers. I directed you to contact D&S sales on multiple occasions and you kept putting it off in spite of being given a deadline until I called them myself. You were directed to use hubspot and have not logged in since your initial login, I have record of your logins. You are directly not following direction from your supervisor which is grounds in itself for termination. Glenn gave you directive on 8/23 to offer the customer 2% up to 3% and it is not in your authority to do otherwise as I and Glenn set pricing and discount structure, saving the company money or not you directly defied what Glenn told you to do. Effective immediately your employment with Flex is terminated.

Doc. 27, p. 63.

## II. LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law * * *.

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *White v. Turfway Park Racing Ass'n, Inc*., 909 F.2d 941, 943–944 (6th Cir. 1990).

A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–1480 (6th Cir. 1989) (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material

fact. *Fulson v. City of Columbus,* 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

## III. LAW AND ANALYSIS

Plaintiff asserts claims against Flex for 1) discrimination under of the Americans with Disabilities Act ("ADA"), 2) failure to accommodate under the ADA, 3) disability discrimination under Ohio law, 4) failure to accommodate under Ohio law, 6) retaliation under the ADA, 7) Family Medical Leave Act ("FMLA") interference, and 8) FMLA retaliation. Doc. 2. Plaintiff brings one claim against Tetreault for 5) aiding and abetting discrimination under Ohio law. Id.

### A. Plaintiff's Disability Claims: Counts 1, 3, 5

Plaintiff asserts that Flex discriminated against him for having a disability in violation of Ohio law and the Americans with Disability Act ("ADA") [2]. Doc. 2, p. 5-6, 7-8. He further contends that Tetreault aided and abetted the discrimination. Doc. 2, p. 9-10. Specifically, Plaintiff contends that Defendants discriminated against him by "demoting Plaintiff, failing to accommodate Plaintiff, failing to engage in the interactive process, terminating Plaintiff's employment, and/or otherwise discriminating against him in the terms, privileges, and conditions of his employment." Doc. 2, p. 6. Plaintiff states that his disability was cancer. Doc. 2, ¶17.

The ADA prohibits a covered employer from discriminating against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "That is, an employer may not 'treat[] some

---

[2] Ohio law mirrors the ADA and Ohio courts look to federal interpretation for guidance; as such, this Court will apply the legal standard under the ADA to Plaintiff's claims of disability discrimination under both state and federal law. *King v. Steward Trumbull Memorial Hospital, Inc*., 30 F.4th 551, 560 (6th Cir. 2022).

people less favorably than others' in a term or condition of employment 'because of their' disability. Id. (citation omitted)." *Tumbleson v. Lakota Local Sch. Dist*., 175 F.4th 773, 779-80 (6th Cir. 2026)

Disability discrimination claims premised on indirect evidence are examined under the *McDonnell-Douglas* burden-shifting framework. The plaintiff must first make out a prima facie case to establish a disability discrimination claim. Once the plaintiff overcomes this initial showing, the burden shifts to the defendant to "articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual." *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)(quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, (1973)).

**1. Prime Facie Case**

A prima facie case of disability discrimination under the ADA requires that a plaintiff show: "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment action decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the individual was replaced." *Whitfield v. Tennessee,* 639 F.3d 253, 258-59 (6th Cir. 2011) (quoting *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)).

Defendants contend that Plaintiff cannot satisfy his prima facie burden because the evidence establishes that the decision to terminate was made in June of 2024, well before Plaintiff informed them that this cancer has returned. Doc. 25-1, p. 12. Therefore, Defendants argue, there could be no intentional disability discrimination. Id. However, there is no dispute that Defendants were aware that Plaintiff had cancer in 2019 and continued with follow-up medical visits even

after remission. Doc. 6, ¶ 46; Doc. 27, p. 22. "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). "[C]ancer substantially limits normal cell growth." 29 C.F.R. 1630.2(j)(3)(iii). Accordingly, Plaintiff has established that Defendants were aware he had a disability. Plaintiff concedes that from his initial cancer diagnosis in 2019 to his termination in September 2024, Defendants did not deny any of his requests, discipline him in any way, nor were there any changes to the terms of his employment. Doc. 26, p. 32, 33, 74. Plaintiff agreed that Defendants had taken care of him throughout his cancer. Doc. 26, p. 74. To the extent that the parties tie the adverse action to the *return* of Plaintiff's cancer, those arguments are better discussed in the pretext analysis.

Plaintiff points to two adverse actions: 1) the demotion meeting on September 9, 2024, and 2) his September 19, 2024 termination. Doc. 31, p. 11. While termination is clearly an adverse action, Defendants assert that the purported demotion is not actionable. Specifically, Defendants note that Plaintiff was not demoted at the September 9, 2024 meeting. He was informed "that **effective October 1, 2024**, he *would be* demoted from the management position[.]" (emphasis added) Doc. 2, ¶26. Because Plaintiff was terminated before his demotion was scheduled to take effect, he suffered no reduction in pay, grade, duties, benefits or status that could be attributed to a demotion. Regardless, as set forth in the Court's recitation of the facts above, Defendants had decided to terminate before the demotion hearing. The fact that Defendants decided to provide a lesser punishment first is not actionable.

Assuming for purposes of this Order that Plaintiff can satisfy his prima facie burden, the burden shifts to Defendants set forth a legitimate, non-discriminatory explanation for the purported adverse actions.

### 2. Defendants' Legitimate Non-Discriminatory Explanation

The ADA protects individuals from discrimination because of a disability. It does not, however, guarantee continued employment because of a disability. Therefore, employers can point to legitimate non-discriminatory reasons to justify the adverse action. Defendants contend that Plaintiff was terminated due to poor performance and insubordination. Doc. 25-1, p. 13, 17. Defendants assert that they had made the decision to terminate Plaintiff prior to being told of his reoccurrence of cancer, leaving open the issue of *when* the termination would occur; immediately or after a suitable candidate was found to replace him.

In her termination letter, Tetreault set forth various performance/insubordination issues as the basis for termination: 1) the Vertex situation, 2) internal complaints about Plaintiff not doing his job and passing work off on others, 3) specific issues with Plaintiff failing to call on customers despite deadlines, and 4) Plaintiff's failure to use hubspot as required. Doc. 27-12.

Plaintiff's only opposition to this explanation is that there is no contemporaneous documentation from Burket[3], the sole decision-maker, regarding his intent to fire Plaintiff due to performance issues. Doc. 31, p. 14. Plaintiff asserts the explanation relies on Tetreault's "second-hand accounts" and therefore requires a credibility determination that cannot be made on summary judgment.

Defendants are not required to present evidence from Burket to support their explanation. Instead, Defendants must "clearly set forth, through the introduction of admissible evidence, the reasons for [the adverse action]." *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 255 (1981). Plaintiff does not set forth any specific challenges to the basis for termination at this stage of the

---

[3] As noted above, Burket passed away after the events at issue in this case but before the lawsuit was filed.

*McDonnell Douglas* analysis. Plaintiff does not dispute that Flex's sales declined through Plaintiff's tenure as sales manager. Doc. 31, p. 16. "'Poor performance is a legitimate non-discriminatory reason for terminating an employee.'" *Becker v. Elmwood Local Sch. Dist*., 519 F. App'x 339, 343 (6th Cir. 2013) (quoting *Stockman v. Oakcrest Dental Ctr., P.C*., 480 F.3d 791, 802 (6th Cir. 2007) (citation omitted)). Defendants support their explanation through, but not limited to, Tetreault's testimony and declaration, multiple email discussions involving a consultant brought in to address declining sales (as stated in the Court's recitation of the facts above), and the termination email itself. Plaintiff presents no basis for the Court to disregard this evidence.

Accordingly, the burden shifts to Plaintiff to show that Defendants' stated explanation is pretextual.

**3. Pretext**

"When an employer offers nondiscriminatory reasons for an adverse employment action, the burden shifts back to the employee to prove that the stated reason for the termination is pretextual." *Becker*, supra at 343 (citing *Blizzard v. Marion Technical College*, 698 F.3d 275, 284 (6th Cir. 2012). Plaintiff has the burden of producing sufficient evidence from which a jury could reasonably reject Defendants' explanation for his termination. Id.

"To establish pretext, the plaintiff is required to show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that the proffered reasons were insufficient to motivate discharge." *Wallace v. Edward W. Sparrow Hosp. Ass'n*, 782 F. App'x 395, 404 (6th Cir. 2019) (citing *Coomer v. Bethesda Hospital, Inc*., 370 F.3d 499, 511 (6th Cir. 2004) (citation omitted)).

**a) Basis in Fact**

Plaintiff contends that Defendants' reasons for termination, poor performance and insubordination, have shifted throughout litigation and therefore a reasonable jury could doubt that this was the real reason for termination. Doc. 31, p. 15. The Court disagrees. As fully set forth above, Burket, Roberts, and Tetreault consistently discussed Plaintiff's inability to lead the sales team as necessary to increase sales revenue. Among these discussions, they mention Plaintiff's failure to follow specific directions regarding certain clients and technology. Thus, Plaintiff's insubordination resulted in poor performance. Finally, the termination letter fully sets forth concerns from other employees about him "not performing your job" and includes several instances of insubordination. Doc. 27-12. Thus, Plaintiff fails to show that Defendants' basis for termination was inconsistent.

Plaintiff further argues that "[t]he specific example of insubordination cited by Flex is in dispute." Doc. 31, p. 14. Specifically, Plaintiff argues that Burket's directions regarding the rebate offer are in dispute, and any of the evidence presented about it is inadmissible hearsay as to what Burket instructed. Doc. 31, p. 15. This argument is without merit. Even assuming there was a dispute as to what was said at the sales meeting, in response to Plaintiff's email, Tetreault reiterated the discussion: "[Burket] and [Roberts] said ask them what they are looking for % wise first, tell them we are looking to offer 2% over growth but we will go up to 3% per [Burket]." Id. Despite this clear directive, less than two hours later, Plaintiff emailed Vertex and offered a 1.5% rebate. Doc. 29-9, p. 4. Tetreault was Plaintiff's direct supervisor, answering Plaintiff's question on how to handle a client with a direct order. Plaintiff admits that he did not comply with Tetreault's specific instructions. Doc. 26, p. 101. Plaintiff fails to show by a preponderance of the evidence that the proffered reasons had no basis in fact.

**b) Actual Motivation**

Plaintiff contends that Defendants came up with declining revenue as a reason for termination only after Plaintiff initiated the lawsuit. Doc. 31, p. 16. For the same reasons set forth above, this argument fails. The evidence establishes that Defendants were concerned about declining sales and attributed it, at least in part, to Plaintiff's poor performance. The fact that the termination letter does not specifically state "declining sales" as a basis for termination is not dispositive of this issue. The letter sets forth performance issues and insubordination issues that contribute to his inability to manage the sales team thus leading to declining sales. In other words, the declining sales were the consequence of Plaintiff's poor performance and insubordination issues, and he was terminated for those actions. Plaintiff provides no support for his contention that the termination letter must set forth every basis for termination with specificity including the natural consequences of the specified issues.

Next, Plaintiff asserts that Burket blamed the entire sales team for the declining revenue and that "Flex only selected the disabled employee for termination." Doc. 31, p. 16. This argument is without merit. Defendants had concluded that "[o]ur sales manager doesn't manage people[.]" Doc. 25-4. Defendants further determined that Plaintiff "may not have the skills to drive revenue growth" (doc. 25-3, p. 4) and was "not well suited for the position and that [the] job is far too vital to our success" (doc. 25-4). Thus, the evidence establishes that Defendants did not single out Plaintiff because he was disabled but rather held him responsible for the declining revenue as the manager of the sales team.

Plaintiff further asserts that declining revenue was attributed to many factors outside of his control. Doc. 31, p. 17. While this may be true, this does not address Plaintiff's specific performance and insubordination issues as set forth above. Even assuming Plaintiff was only one

of many factors leading to declining revenue, Defendants had determined that he did not have the skills to *increase* growth as necessary.

Lastly, Plaintiff concedes that he did not enter his sales in HubSpot as Tetreault directed. Doc. 31, p. 17. While Plaintiff admits to ignoring a direct order from his supervisor, he attempts to justify this by asserting that other account managers did not use HubSpot as directed. Id. Again, Plaintiff was the sales manager, not an account manager, and thus expected to lead the sales team. To establish pretext based on the treatment of another employee, the employee must be similar in all relevant respects without any mitigating or differentiating circumstances. *Bass v. White Castle Sys.*, No. 1:09CV2516, 2014 U.S. Dist. LEXIS 154946, at *10-11 (N.D. Ohio Oct. 31, 2014). To be similarly situated, Plaintiff must show facts that the employee "'dealt with the same supervisor, [had] been subject to the same standards and [had] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" Id. (quoting *Russell v. Univ. of Toledo*, 537 F.3d 596, 607 (6th Cir. 2008)). Plaintiff makes no attempt to show that as the sales manager he was similarly situated to a member of his own sales team. Accordingly, Plaintiff fails to show by a preponderance of the evidence that the proffered reasons did not actually motivate his discharge.

**c) <u>Sufficient Reasons</u>**

Plaintiff contends that the Vertex situation was insufficient to motivate his termination because he successfully negotiated a deal with the client. Doc. 31, p. 17. First, the Court notes that the Vertex situation was not the only basis for termination, but rather, as the Plaintiff acknowledges was the "final straw". Doc. 31, p. 17, citing Doc. 27, p. 63. Plaintiff does not challenge the fact that he ignored direct orders on how to handle the Vertex situation. He does not

acknowledge that these orders were given in the context of coaching/retaining him due to concerns about performance issues.

Finally, Tetreault explained that although Plaintiff's "risk" in offering a lower percentage might have been successful, Vertex's "response was not necessarily committal of giving us the increased footages so for all we knew she was not going to us give us the extra business." Doc. 29-9, p. 2. By ignoring Defendants' directive, Plaintiff put them in the position to potentially lose business. The fact that the risk might have been successful does not negate the fact that it was a risk Defendants were trying to avoid. Accordingly, Plaintiff fails to show by a preponderance of the evidence that the proffered reasons were insufficient to motivate the discharge.

Plaintiff fails to show that Defendants' non-discriminatory basis for his termination was pretextual and therefore his disability discrimination claim under the ADA and Ohio law fail as a matter of law. Defendants' motion for summary judgment as to Counts 1 and 3 is GRANTED. Because Plaintiff fails to establish any discriminatory conduct, his claim against Tetreault for aiding and abetting also fails. *Buddenberg v. Estate of Weisdack*, 711 F. Supp. 3d 712 (N.D. Ohio 2024). Tetreault's motion for summary judgment on Count 5 is GRANTED.

**B. Plaintiffs Failure to Accommodate, retaliation, and FMLA Interference claims; Counts 2, 4, 6, 7, 8**

In his opposition, Plaintiff sums up Defendants' arguments against the remainder of his claims against Flex as follows:

> Defendants' arguments for summary judgment on Plaintiff's failure to accommodate, retaliation, and FMLA interference claims (Counts 2, 4, 6, 7, and 8) all rise and fall on the same disputed factual contention: that Flex had already decided to terminate Mr. Kosla's employment before September 18, 2024. If that were true, Defendants argue, Mr. Kosla had no right to the accommodations or job-protected leave he requested that day, and his requests could not have caused his termination the next afternoon. (Defs.' Br. at 17–18.)

Doc. 31, p. 12. The Court concurs with Plaintiff's summation of Defendant's arguments to the extent that they all rely on the premise that the decision to terminate was made prior to September 18, 2024.

As to Counts 2 and 4, failure to accommodate, Defendants argue that Flex "cannot fail to provide an accommodation it didn't know [Plaintiff] needed until after it had decided to terminate his employment." Doc. 25-1, p. 15. As to Count 6, ADA retaliation, Defendants assert Plaintiff "did not request an accommodation for a disability until after [Flex] had made the decision to terminate him. It follows that this request could not have motivated his termination." Doc. 25-1, p. 16. Regarding Count 7, FMLA interference, Defendants contend that "[a]n employee's request for FMLA leave 'does not shield [him] from the previously-made decision to terminate [his] employment.' *Mann v. Navicor Group, LLC*, 488 Fed. Appx. 994, 1001 (6th Cir. 2012)). Doc. 25-1, p. 17. Finally, as to Count 8, FMLA retaliation, Defendants assert that "[a]s with his discrimination and FMLA interference claims, Kosla's FMLA retaliation claims must fail because he cannot establish a causal connection between his request for FMLA leave and his termination. At the prima facie stage, he must produce some evidence to deduce a causal connection. He has no such evidence, because the decision to terminate his employment was made before he notified Defendants of his need for leave." Doc. 25-1, p. 18.

In opposition, Plaintiff contends that "[i]f a jury were to find that Flex had not yet decided to terminate Mr. Kosla's employment as of September 18, then Defendants were obligated under the ADA to engage in the interactive process and consider reasonable accommodations. Their failure to do so creates a genuine dispute of material fact on Counts 2 and 4. Likewise, under the FMLA, Mr. Kosla was entitled to job-protected intermittent leave for cancer treatment, and termination the next day would constitute interference." Doc. 31, p. 13. Plaintiff contends that if

the decision to terminate was not made prior to September 18, then the temporal proximity to the adverse action supports his claims. Id

Thus, the parties agree that the operative fact at issue is *when* the decision to terminate was made. Plaintiff asserts that the Court cannot determine this issue of fact at the summary judgment phase. However, as set forth in the recitation of facts above, the documented evidence is clear that the decision to terminate was made not only prior to September 18, 2024, but as early as June 26, 2024. Doc. 25-3. Even if the Court were to set that initial discussion aside, documented evidence and testimony establish that Tetreault had engaged a recruiting firm to find Plaintiff's replacement on August 19, 2024. Doc. 25-2, ¶14; Doc. 25-6. Accordingly, the Court concludes that there can be no dispute of the operative fact at issue, when the decision to terminate was made, and therefore, Defendant is entitled to judgment as to Counts 2, 4, 6, 7, and 8 as a matter of law. Defendants' motion for summary judgment on these claims is GRANTED.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and this matter is DISMISSED.

**IT IS SO ORDERED.**

**October 9, 2026**
**Date**

**/s/ John R. Adams**
**John R. Adams**